**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER SMITH,** | : | |
| | : | |
| *Plaintiff / Counterclaim-Defendant,* | : | |
| | : | |
| **v.** | : | No. 5:24-cv-02134-JFL |
| | : | |
| **THE FINTEX GROUP, LLC and** | : | **JURY TRIAL DEMANDED** |
| **ANDREW WEINSTEIN,** | : | |
| | : | |
| *Defendants / Counterclaim-Plaintiffs.* | : | |

---

## DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

---

Defendants, The Fintex Group, LLC ("**Fintex**") and Andrew Weinstein (collectively, "**Defendants**"), through their counsel, McNees Wallace & Nurick LLC, submit this Answer, Affirmative Defenses, and Counterclaims as follows:

### NATURE OF ACTION

1.      Defendants deny the allegations in Paragraph 1 of the Complaint and further state that they are conclusions of law to which no responsive pleading is required. In further response, and in Plaintiff's own words, his function vis-à-vis the Defendants was "informal." Defendants specifically deny that they are liable to Plaintiff.

### PARTIES

2.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 of the Complaint, so the allegations are denied.

3.      Defendants admit that Fintex is a Delaware limited liability company and that it does business nationally and internationally. The remaining allegations are denied. In further

response, Fintex's business address is 3411 Silverside Road, Tatall Building 104, Wilmington, Delaware 19810.

4.      Admitted.

## JURISDICTION AND VENUE

5.      Defendants admit that Fintex is a Delaware resident, and that Mr. Weinstein is a California resident. The remaining allegations in Paragraph 5 of the Complaint are conclusions of law to which no responsive pleading is required.

6.      Defendants deny the allegations in Paragraph 6 of the Complaint and further state that they are conclusions of law to which no responsive pleading is required.

7.      Defendants deny the allegations in Paragraph 7 of the Complaint and further state that they are conclusions of law to which no responsive pleading is required.

## FACTUAL BACKGROUND

8.      Defendants deny the allegations in Paragraph 8 of the Complaint. In further answer, around January 2023, Plaintiff—after his termination from Convera—approached Mr. Weinstein about getting involved with Fintex's prospective projects. Around that time, Plaintiff informed Mr. Weinstein that he would not require compensation anytime soon because he was financially secure. This is evident in his February 2023 email to Mr. Weinstein. Plaintiff wrote, "[t]here's no need for high consulting fees *since I'd be participating in upside economics. Besides, there may be other ways for the [portfolio companies] to put working capital to use* that will help drive growth."[1] In this same email, Plaintiff memorialized his intention to be compensated by a portfolio company— not by Fintex. "Following our conversation . . . I've been thinking about go [*sic*] forward [portfolio company] fees for my LLC[.]" Plaintiff continued, "[a] $25K/month retainer per [portfolio

---

[1] Emphasis added.

company.] I imagine there'd be more work up front and then strategic advisory once the [portfolio company] is cranking." In other words, Plaintiff contemplated being paid $25,000 per month by a portfolio company—not by Fintex—once a deal was consummated. Based on Plaintiff's own words, he understood that (a) any compensation he would have received was wholly success-based and (b) that he would receive no compensation for success that he played no part in creating.

9. Defendants deny the allegations in Paragraph 9 of the Complaint. In further answer, Defendants did not offer Plaintiff employment. Instead, Plaintiff volunteered to become involved with Fintex's prospective projects. At that time, Defendants stressed to Plaintiff that Fintex lacked defined positions as a new entrepreneurial venture. Plaintiff understood this. Accordingly, Mr. Weinstein stressed to Plaintiff that any compensation would be strictly contingent upon successful transactions. Plaintiff understood this, too. Plaintiff's understanding of this is evident in his February 2023 email to Mr. Weinstein. Plaintiff wrote, "There's no need for high consulting fees *since I'd be participating in upside economics. Besides, there may be other ways for the [portfolio companies] to put working capital to use* that will help drive growth."[2] Defendants admit that there were no written agreements. Answering further, any verbal understandings between Plaintiff and Defendants were in the early stages of formation, and, as a result, they lacked the definitiveness for Plaintiff to allege he was owed a specific amount. Even if a successful transaction occurred, Plaintiff and Defendants would have had to discuss and negotiate compensation.

10. Defendants deny the allegations in Paragraph 10 of the Complaint. In further answer, Plaintiff sought opportunities to insert himself into Fintex activities and to become involved in prospective projects that Fintex was evaluating, including conducting diligence, even beyond what Fintex required, for Baia, SnapB2B, ActiveWorx, Mymo, Dave.com, and Global

---

[2] Emphasis added.

Payments. Crucially, Plaintiff acknowledged in writing in February 2023 that he required "no fees or costs for [d]ue [d]iligence."

11. Defendants deny the allegations in Paragraph 11 of the Complaint. In further answer, Defendants did not represent to Plaintiff that any compensation was imminent. From the beginning, Plaintiff knew that the potential to earn compensation would be based on material contributions that resulted in Fintex's financial success. Plaintiff's understanding of this is evident in his February 2023 email to Mr. Weinstein. Plaintiff wrote, "[t]here's no need for high consulting fees *since I'd be participating in upside economics. Besides, there may be other ways for the [portfolio companies] to put working capital to use* that will help drive growth."[3] But unfortunately for Plaintiff and Defendants, Plaintiff did not materially contribute to Fintex's success. Based on information and belief, Plaintiff never requested expense reimbursement until late September 2023, after he concluded his association with Fintex and engaged counsel. Likewise, Plaintiff never demanded compensation during his nine-month association with Fintex, and for good reason: he knew he had done nothing to earn it.

12. Defendants admit that Plaintiff concluded his "informal" association with Fintex in September 2023. Defendants deny the remaining allegations in Paragraph 12 of the Complaint.

13. Defendants deny the allegations in Paragraph 13 of the Complaint. In further answer, Defendants never asked or encouraged Plaintiff to discontinue any businesses.

14. Defendants deny the allegations in Paragraph 14 of the Complaint. In further response, Plaintiff's efforts did not positively contribute to any transactions conducted by Mr. Weinstein or Fintex or create any financial success for Defendants. On the contrary, Plaintiff's efforts hindered Defendants' transactions and created unnecessary expenses.

---

[3] Emphasis added.

## FRAUDULENT INDUCEMENT

### (Against The Fintex Group LLC and Andrew Weinstein)

15.     Defendants incorporate their answers to Paragraphs 1 through 14 *supra* as if set forth in full.

16.     Defendants deny the allegations in Paragraph 16 of the Complaint.

17.     Defendants deny the allegations in Paragraph 17 of the Complaint.

18.     Defendants deny the allegations in Paragraph 18 of the Complaint and further state that they are conclusions of law to which no responsive pleading is required.

19.     Defendants deny the allegations in Paragraph 19 of the Complaint and further state that they are conclusions of law to which no responsive pleading is required.

## BREACH OF CONTRACT

### (Against The Fintex Group LLC)

20.     Defendants incorporate their answers to Paragraphs 1 through 19 *supra* as if set forth in full.

21.     Defendants deny the allegations and legal conclusions in Paragraph 21 of the Complaint. Defendants aver that there was never an enforceable contract between or among Plaintiff, Fintex, or Mr. Weinstein.

22.     Defendants deny the allegations and legal conclusions in Paragraph 22 of the Complaint.

23.     Defendants deny the allegations and legal conclusions in Paragraph 23 of the Complaint. Defendants aver that no amount is owed to Plaintiff.

## UNJUST ENRICHMENT

### (Against The Fintex Group LLC)

24.     Defendants incorporate their answers to Paragraphs 1 through 23 *supra* as if set forth in full.

25.     Defendants deny the allegations in Paragraph 25 of the Complaint. In further answer, Plaintiff's efforts hindered Defendants' transactions and created unnecessary expenses.

26.     Defendants deny the allegations and legal conclusions in Paragraph 26 of the Complaint.

27.     Defendants deny the allegations and legal conclusions in Paragraph 27 of the Complaint.

28.     Defendants deny the allegations and legal conclusions in Paragraph 28 of the Complaint. Defendants aver that no amount is owed to Plaintiff.

## PROMISSORY ESTOPPEL

### (Against The Fintex Group LLC)

29.     Defendants incorporate their answers to Paragraphs 1 through 28 *supra* as if set forth in full.

30.     Defendants deny the allegations and legal conclusions in Paragraph 30 of the Complaint.

31.     Defendants deny the allegations and legal conclusions in Paragraph 31 of the Complaint. Defendants aver that no amount is owed to Plaintiff.

## PENNSYLVANIA WAGE AND HOUR STATUTES

32.     Defendants incorporate their answers to Paragraphs 1 through 31 *supra* as if set forth in full.

33.     Defendants deny the allegations and legal conclusions in Paragraph 33 of the Complaint. Defendants aver that Fintex never employed Plaintiff and that Plaintiff was never an "employee" within the meaning of the Pennsylvania Minimum Wage Act or the Pennsylvania Wage Payment and Collection Law. Further, Defendants aver that Plaintiff had no contractual basis to assert a claim under the Pennsylvania Wage Payment and Collection Law.

34.     Defendants deny the allegations and legal conclusions in Paragraph 34 of the Complaint. Defendants aver that Plaintiff is not entitled to relief under the Pennsylvania Minimum Wage Act or the Pennsylvania Wage Payment and Collection Law.

35.     Defendants deny the allegations and legal conclusions in Paragraph 35 of the Complaint. Defendants aver that no amount is owed to Plaintiff.

36.     Defendants deny the allegations and legal conclusions in Paragraph 36 of the Complaint. Defendants aver that no amount is owed to Plaintiff.

**WHEREFORE**, Defendants demand the entry of judgment in their favor and against Plaintiff, together with such other relief as the Court deems just and proper.

<u>**AFFIRMATIVE DEFENSES**</u>

In further response to the Complaint, Defendants allege the following affirmative defenses:

<u>**First Defense**</u>

The Complaint fails to state, in whole or in part, any claim upon which relief may be granted.

<u>**Second Defense**</u>

Plaintiff's claims are barred, in whole or in part, by Plaintiff's fraud, dishonesty, and/or misrepresentations.

### Third Defense

Plaintiff's claims are barred by the doctrine of unclean hands.

### Fourth Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff lacks standing.

### Fifth Defense

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations and/or repose.

### Sixth Defense

Plaintiff's claims are barred by laches.

### Seventh Defense

Plaintiff's claims are barred by estoppel.

### Eighth Defense

Plaintiff's claims are barred by waiver.

### Ninth Defense

Plaintiff's claims are barred, in whole or in part, because there was no meeting of the minds related to Plaintiff's association with Fintex.

### Tenth Defense

Plaintiff's claims are barred, in whole or in part, because there was no enforceable contract between or among Plaintiff, Fintex, or Mr. Weinstein.

### Eleventh Defense

Plaintiff's claims are barred, in whole or in part, because the Plaintiff failed to mitigate his alleged damages or losses.

### Twelfth Defense

Plaintiff's claims are barred by the doctrine of unjust enrichment.

### Thirteenth Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

### Fourteenth Defense

Plaintiff's claims are barred, in whole or in part, by failure of consideration.

### Fifteenth Defense

Plaintiff's claims are barred, in whole or in part, by lack of consideration.

### Sixteenth Defense

Plaintiff's claims are barred, in whole or in part, due to one or more mistakes of fact.

### Seventeenth Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of novation.

### Eighteenth Defense

Plaintiff's claims are barred, in whole or in part, by the statute of frauds.

### Nineteenth Defense

Plaintiff's claims are barred, in whole or in part, by the doctrines of merger, release, settlement, discharge and/or set off.

### Twentieth Defense

Plaintiff's claims are barred, in whole or in part, by Plaintiff's own acts or omissions.

### Twenty-First Defense

Defendants at all times acted with good faith, on reasonable grounds, and without any intent to harm.

**Twenty-Second Defense**

Plaintiff's claims are barred, in whole or in part, because Plaintiff suffered no damage or because any damage claimed is speculative and/or impossible to ascertain.

**Twenty-Third Defense**

Defendants are not subject to subject-matter jurisdiction.

**Twenty-Fourth Defense**

Plaintiff's claims are barred by the doctrine of excuse or justification.

**Twenty-Fifth Defense**

All of Defendants' actions challenged by Plaintiff were made or taken in good faith and in compliance with the Pennsylvania Minimum Wage Act or the Pennsylvania Wage Payment and Collection Law.

**Twenty-Sixth Defense**

Plaintiff was not an "employee" under the Pennsylvania Minimum Wage Act or the Pennsylvania Wage Payment and Collection Law.

**Twenty-Seventh Defense**

Plaintiff acted as an independent contractor during his time at Fintex.

**Twenty-Eighth Defense**

Plaintiff has no contractual entitlement to wages.

**Twenty-Ninth Defense**

Defendants owed no contractual duty to Plaintiff.

**Thirtieth Defense**

Defendants made no statements to Plaintiff that they knew, or should have known, were false, deceptive, or misleading.

### Thirty-First Defense

Plaintiff's claims are barred, in whole or in part, as a matter of setoff in connection with fees, costs, and expenses incurred by Defendants to correct and complete any services that the Plaintiff may have failed to perform properly.

### Thirty-Second Defense

Plaintiff is not entitled to liquidated damages because Plaintiff cannot demonstrate that Defendants have no good-faith defense to Plaintiff's Pennsylvania Wage Payment and Collection Law claim.

### Thirty-Third Defense

Defendants reserve the right to supplement this Answer and Affirmative Defenses with additional defenses that may become available or apparent during investigation, discovery, or trial preparation.

**WHEREFORE**, Defendants demand the entry of judgment in their favor and against Plaintiff, together with such other relief as the Court deems just and proper.

\*       \*       \*       \*       \*

### COUNTERCLAIMS

In further response to the Complaint, The Fintex Group, LLC ("**Fintex**") and Andrew Weinstein state the following as their Counterclaims against Christopher Smith:

### PARTIES

1.      Upon information and belief, Mr. Smith resides in Easton, Pennsylvania.

2.      Fintex is a Delaware limited liability company with a registered agent at 3411 Silverside Road, Tatall Building 104, Wilmington, Delaware 19810.

3.      Mr. Weinstein resides at 11 Makin Grade, Ross, California 94957.

## JURISDICTION

4.    This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

5.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mr. Smith's claims occurred in this district.

## FACTUAL BACKGROUND

### *Mr. Smith Seeks Co-Venturing Opportunities with Fintex*

6.    Mr. Smith and Mr. Weinstein first met in 2021 when Mr. Weinstein was about to assume the role of Chief Commercial Officer of Convera. Mr. Weinstein was evaluating external consulting services at the behest of his CEO. Mr. Weinstein was introduced to Mr. Smith by Global Payments, Inc. ("**GPN**") executive James Laurie, who recommended Mr. Smith as a capable consultant for sales organizations as proven by providing similar services to GPN. Mr. Smith consulted with GPN and was eventually hired in-house with Convera as a Senior Vice President before he was terminated.

7.    Mr. Weinstein left Convera in November 2022.

8.    Mr. Smith was terminated from Convera around December 2022.

9.    Shortly after Convera fired him, Mr. Smith contacted Mr. Weinstein and asked if there were any new business opportunities in which Mr. Smith could invest his time.

10.    Mr. Weinstein told Mr. Smith that he and some other colleagues were considering a new entrepreneurial initiative. Mr. Weinstein told Mr. Smith the project would be very risky and uncertain. It would be entrepreneurial. The plan was early in definition, but the colleagues agreed

that there would be no urgency and that the plan would likely require eighteen months before it was fully formed (a broadly understood timetable for launching any new private equity or similar investment platform). And any such hypothetical return would be entirely driven by the project's success (and each venturer's individual success).

11. Mr. Smith stated his desire to be involved in any way possible and that he was "excited for this moonshot."

12. Regarding not receiving any monetary benefit for a prolonged period, Mr. Smith was unfazed. He told Mr. Weinstein that because of the money he anticipated making with the self-storage project in which he was involved—and through which he expected to receive $15 million—he was ready and willing to accept the venture's risk.

13. Mr. Weinstein told Mr. Smith that he would never receive a salary or be employed or engaged as a contractor. The potential project would only be a success-based entrepreneurial venture. Mr. Smith understood this.

14. In early 2023, the potential venture was formed; Fintex was born.

15. From the beginning, Fintex's mission was simple: Build a firm of highly senior venturers and investors to work together on select projects in financial technology where the firm would invest and provide operational mettle. All projects required scaled, strategic operating companies as beachheads for investment and operations.

16. Fintex's business structure is "open architecture." In other words, any individual associated with the firm can assume an infinite number of outside jobs or projects and contribute as little or as much as he wants to Fintex. As demonstrated by the initial half dozen individuals who chose to be involved at Fintex, an individual's level of involvement could range from a hobby (only two-to-three hours per week) to a full-time endeavor.

17. In February 2023, Mr. Smith became involved with Fintex.

18. At that point, Mr. Smith was again told that Fintex was a success-based venture. He was told about Fintex's "open architecture" structure many times. Moreover, Fintex was aware that Mr. Smith's self-storage project was a priority to him, and, as such, it was made clear to Mr. Smith that Fintex would not impede his time spent on the self-storage project.

19. Mr. Smith never signed an employment agreement or other document requiring Fintex to pay him a salary or compensation.

20. Mr. Smith sought projects and work and wanted to get involved with Fintex in every way possible.

### *Self-Serving, Misleading, and Totally Deficient Due Diligence: The ActiveWorx Project*

21. Mr. Smith's self-serving and shoddy work on two projects—"ActiveWorx" and "Global Payments"—cost Fintex and Mr. Weinstein dearly.

22. On or about February 2023, Snap Accounts Payable Corporation's ("**SnapB2B**") CEO JD Drapeau suggested that Fintex seek to acquire ActiveWorx and merge it with SnapB2B.

23. Mr. Smith eagerly volunteered to lead ActiveWorx's diligence, which included, without limitation, reviewing the data room, running due diligence, and making customer reference calls. He asked to lead all the due diligence required for this transaction—from the beginning to the end. There was no expectation—much less agreement—that Mr. Smith would be compensated for this work.

24. Mr. Smith led the due diligence mostly on his own but used resources, including Loeb & Loeb LLP for legal due diligence and Mike Lemberg for analyzing the financials. He occasionally conferred with Mr. Weinstein about the progress of his review.

25.     Based on their discussions and what Mr. Weinstein gleaned from joining a customer reference call, Mr. Weinstein was skeptical about ActiveWorx's viability.

26.     Despite Mr. Weinstein's skepticism, Mr. Smith insisted that ActiveWorx was a "hidden gem." He admitted that ActiveWorx was poor at managing customers. But he stated that with some tech upgrades, it could be a very profitable business.

27.     On his own behalf, Mr. Smith contacted Atlantic Community Bankers Bank ("**ACBB**") to help build a strategic rationale to further support the ActiveWorx acquisition argument.

28.     Mr. Smith expressed positive sentiments about ActiveWorx that led Fintex to engage attorneys to begin legal due diligence on the ActiveWorx project. Based on his recommendation, Fintex engaged counsel.

29.     In April 2023, Mr. Weinstein, Mike Lemberg, Mr. Smith, and SnapB2B's leadership traveled to Pennsylvania to meet with ActiveWorx's leadership in Philadelphia.

30.     During those meetings, Mr. Weinstein quickly confirmed his suspicions, after a cursory questioning of ActiveWorx's leadership, that ActiveWorx was a brittle company with legacy technology whose leadership was grossly incompetent concerning strategy, allocating capital, and managing its investors.

31.     Specifically, ActiveWorx's relationship with its customers was quite tenuous. Its customer roster was poor. Both retaining customers and growing them were uncertain. Further, ActiveWorx had and continued to invest extensive capital in a payment product that, by management's own admission, had no chance of being viable. They represented that they had induced their private equity sponsor to get involved in the business through a mutual colleague, industry luminary Joe Proto, who sold the sponsor on a vision of ActiveWorx evolving into a

modern payments technology firm. The investment was made to support this story. But in reality, there was no basis that this product would contribute to the business's future success. In other words, ActiveWorx was a company with little chance of growth and rife with fundamental flaws. By its evolving but even then, clear charter, Fintex was not in the business of investing its capital or its time on stagnant or failing enterprises.

32.     Mr. Smith overlooked these glaring risks; he saw opportunities where he should have seen risks. For example, he either misunderstood the information he received in various customer reference calls or ignored such critical information because he was determined to facilitate the ActiveWorx deal even if the deal was contrary to Fintex's interests.

33.     Had Mr. Smith done a minimally competent job on the due diligence for this project, Mr. Weinstein and Mr. Lemberg would have never gone to Pennsylvania to meet with ActiveWorx's leadership. They traveled to this meeting only because of the information they received from Mr. Smith, which was the product of Mr. Smith's faulty due diligence. Had they been provided with accurate information reflecting the true state of ActiveWorx, they never would have attended this meeting.

34.     Mr. Smith's foolhardy insistence that ActiveWorx was a "hidden gem" cost Fintex *hundreds of thousands of dollars*—in legal due diligence, technology due diligence, and the cost of the trip to Pennsylvania to meet with ActiveWorx's leadership. Mr. Smith's failed due diligence also created opportunity costs for Fintex—delaying other deals—and risks for the firm.

35.     Mr. Smith's inaccurate due diligence was self-serving. As a resident of Pennsylvania, Mr. Smith had a personal interest in securing favorable treatment for ActiveWorx (based in Pennsylvania). And he had a personal interest in utilizing ACBB (also a Pennsylvania-based entity) for the deal, where he had personal relationships with leadership. That is because Mr.

Smith could have played a senior role in both local businesses, so he was incentivized to advocate for ActiveWorx—despite its glaring issues.

***Shoddy Work Product and Massive Costs: The GPN Project***

36.     After the ActiveWorx project fell apart, Fintex discovered that SnapB2B had a customer called IFI Professionals ("**IFI**").

37.     In May 2023, this discovery led Mr. Weinstein to discuss potential synergies between SnapB2B and GPN with Lance Hafner (Chief Revenue Officer for GPN's North American division).

38.     On May 23, 2023, Lance Hafner offered to Mr. Weinstein to contribute approximately $7.5 million as a market incentive toward Fintex, which Fintex could use to both buy SnapB2B to then service IFI and cover the costs of its ordinary operations in partnership with GPN and other projects. He believed that he could finalize the deal in two weeks.

39.     Mr. Hafner requested confirmatory financial data regarding IFI, which Mr. Smith enthusiastically volunteered to prepare. Using the information he independently obtained from SnapB2B personnel and IFI, he built a model for the IFI relationship. There was no expectation— much less agreement—that Mr. Smith would be compensated for this work.

40.     In June 2023, the finance team at GPN resisted this model and said it was problematic. Mr. Smith's model raised many questions and created much additional work.

41.     The more Mr. Smith worked on the model, the worse the situation became. As the situation deteriorated, closing the deal with SnapB2B became less likely.

42.     By August, Mr. Hafner's confidence in May had wilted to significant uncertainty. GPN withdrew the approximately $7.5 million initially offered toward the deal, reducing this sum

and requiring certain performance provisions. This meant that Fintex would need to capitalize on its well-defined plan by other means.

43.     Around this time, Mr. Smith told Mr. Weinstein and Fintex advisor James Laurie that he was scheduled to meet with the CEO of IFI in August 2023. But this meeting never occurred. Mr. Smith told Mr. Weinstein and Mr. Laurie that he was frustrated that he could not provide more details and that he had no idea why the meeting was scuttled. This uncertainty and the tension with GPN created a schism between Mr. Smith and the other co-venturers at Fintex, including Mr. Weinstein, Mr. Laurie, David Knight Legg, and Jeffrey Hyman.

44.     This tension manifested in September 2023. At a professional function in Marin County, California—after multiple interactions where multiple attendees rebuked Mr. Smith's contribution to Fintex to help improve Fintex's work quality—Mr. Smith unilaterally decided to leave the function without saying a word. The next day, Mr. Laurie saw Mr. Smith in the hotel lobby. When Mr. Laurie spoke with Mr. Smith, it became clear that Mr. Smith intended to leave and that his association with Fintex had ended. Mr. Smith offered little rational explanation for his abrupt departure—other than the obvious issue that his efforts were not driving success and that he knew that Fintex was success-oriented.

45.     After Mr. Smith left, Fintex and Mr. Weinstein were able to salvage the GPN project, and Fintex executed a contract on October 17, 2023. Concurrently, Mr. Laurie was able to resuscitate the IFI opportunity. Notably, the CEO of IFI informed Mr. Laurie that Mr. Smith had alienated IFI and that Mr. Smith had expressed an arrogance that turned him off. The CEO of IFI made it clear that he understood Mr. Smith spoke as a control actor for Fintex and that his decision to reengage with Fintex was based on Mr. Laurie's assurance that Mr. Smith was no longer involved in Fintex, SnapB2B, or GPN.

46.     But the final deal included worse terms than initially contemplated. Specifically, GPN reduced its $7.5 million in upfront capital to $7 million, but this offer was gated by performance. This forced Mr. Weinstein and Fintex to use their own capital to execute the plan, which has required approximately $6 million to date. Although Fintex is in the process of executing the GPN contract, and it believes it will eventually secure the $7 million, it has yet to complete the performance requirements and thus has been forced to capitalize on the business through other means.

47.     If Mr. Smith had done competent work on the model that did not lead to great uncertainty and delay, Mr. Weinstein and Fintex would not have incurred this additional, substantial out-of-pocket cost.

48.     Mr. Smith's incompetence caused the delay, which also created substantial opportunity costs for Fintex, totaling tens of millions of dollars.

49.     In addition to creating the model, Mr. Smith was responsible for managing Fintex's relationship with IFI's CEO. He flopped in that role, antagonizing the CEO with his haughty demeanor.

50.     As an individual who demonstrated to Fintex that he needs to feel needed, Mr. Smith repeatedly engaged in self-serving behavior by volunteering for responsibilities that were beyond his abilities. As a result, he failed in his work on the ActiveWorx and GPN projects. Fintex and Mr. Weinstein justifiably relied on Mr. Smith's purported skills, and that reliance caused significant losses.

## COUNT I[4]
## <u>BREACH OF FIDUCIARY DUTY</u>

51.     Paragraphs 1 through 50 of these Counterclaims are incorporated by reference as if set forth fully herein.

52.     As a venturer associated with Fintex and the individual who voluntarily took charge of the IFI model, Mr. Smith owed a fiduciary duty to Fintex. This duty arose from Mr. Smith's confidential relationship, in which Fintex ceded to him control over building the model for the IFI relationship and being the primary point of contact with the IFI officials.

53.     Mr. Smith's inadequate model created significant risk for Fintex. Additionally, Mr. Smith alienated IFI officials and created critical communication errors that fatally jeopardized the transaction. Ultimately, this caused an extensive delay, and the transaction could not be completed until after Mr. Smith left Fintex. In causing these issues, Mr. Smith acted negligently, failed to act in good faith, and failed to act solely for the benefit of Fintex.

54.     Mr. Weinstein and Fintex suffered injury due to Mr. Smith's failure to act in good faith and solely for the benefit of Fintex. Because of the extensive delay created by Mr. Smith's incompetence and his alienation of IFI's CEO, GPN reduced its offer of $7.5 million to $7 million, and this new offer is gated by performance requirements for Fintex. This required Fintex to use its own capital to execute the plan, which has resulted in approximately $6 million in excess expenses. And the delay created substantial opportunity costs for Fintex—tens of millions of dollars.

55.     Fintex's injuries would not have occurred if Mr. Smith had acted in good faith and solely for Fintex's benefit. If Mr. Smith had acted in good faith, the transaction would not have

---

[4] Each counterclaim is brought by Fintex and Mr. Weinstein against Mr. Smith.

been delayed, and the resultant damages would not have occurred. So, his failure to act in good faith caused Fintex's injuries.

WHEREFORE, Fintex and Mr. Weinstein demand the entry of judgment in their favor and against Mr. Smith, together with such other relief as the Court deems just and proper.

## COUNT II
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

56.     Paragraphs 1 through 55 of these Counterclaims are incorporated by reference as if set forth fully herein.

57.     Around May 2023, Fintex made plans with GPN to purchase SnapB2B. As part of this potential deal, GPN planned to contribute approximately $7.5 million to the purchase.

58.     GPN's North American CRO, Lance Hafner, believed the deal could be finalized within two weeks.

59.     Mr. Smith enthusiastically took part in this project. Principally, he built a model for the IFI relationship with the information he obtained from IFI and SnapB2B. In June 2023, the finance team at GPN resisted this model and said that it was problematic. Mr. Smith's model raised many questions and created much additional work. The more Mr. Smith worked on the model, the more the situation deteriorated. And as the situation deteriorated, closing the deal became more unlikely.

60.     The deal was not finalized until after Mr. Smith stopped collaborating with Fintex.

61.     That was in August 2023—three months after the deal was initially contemplated.

62.     The extensive delay caused by Mr. Smith's shoddy work product, along with his alienation of IFI's CEO, illustrates his intent to harm Fintex by preventing the contract with SnapB2B from occurring.

63.     Mr. Smith had no justification to interfere with the business relationship between Fintex and SnapB2B.

64.     Because of the extensive delay created by Mr. Smith's incompetence and his alienation of IFI's CEO, GPN reduced the $7.5 million it initially said it would contribute to $7 million contingent upon Fintex completing certain performance requirements. This required Fintex to use its own capital to execute the plan, which has resulted in approximately $6 million in excess expenses. And the delay created substantial opportunity costs for Fintex—tens of millions of dollars. Those costs are actual damages that resulted from Mr. Smith's conduct.

WHEREFORE, Fintex and Mr. Weinstein demand the entry of judgment in their favor and against Mr. Smith, together with such other relief as the Court deems just and proper.

## COUNT III
## BREACH OF FIDUCIARY DUTY (ACTIVEWORX)

65.     Paragraphs 1 through 64 of these Counterclaims are incorporated by reference as if set forth fully herein.

66.     As a venturer associated with Fintex and the individual who voluntarily assumed responsibility for conducting due diligence for the potential acquisition of ActiveWorx (without meaningful oversight or control), Mr. Smith owed a fiduciary duty to Fintex. This duty arose from Mr. Smith's confidential relationship in which Fintex ceded to him control over the ActiveWorx due diligence process—from start to finish.

67.     Mr. Smith made many mistakes in his due diligence analysis of ActiveWorx. He overlooked ActiveWorx's fragility and high-risk nature, which were marked by poor strategic management decision-making and poor capital allocation. He failed to realize that ActiveWorx's relationship with its customers was quite tenuous. At best, customers were not prepared to invest

further in ActiveWorx or expand their relationship with them. He also failed to see that ActiveWorx had invested extensive capital in a payment product that had no chance of being viable. He also misunderstood the information he received from customer reference calls. In other words, ActiveWorx was a defective business entity doomed to stagnation. But Mr. Smith missed all this. Moreover, Mr. Smith promoted Fintex's acquisition of ActiveWorx for personal gain. As a Pennsylvania-based business, Mr. Smith (a Pennsylvania resident) could have played a senior role in ActiveWorx. For these reasons, Mr. Smith negligently or intentionally failed to act in good faith and solely for the benefit of Fintex.

68.     Mr. Weinstein and Fintex suffered injury due to Mr. Smith's failure to act in good faith and solely for the benefit of Fintex. Mr. Smith's failure led to the costs Fintex incurred from Mr. Weinstein and Mike Lemberg's trip to Pennsylvania to meet with ActiveWorx's leadership. The legal due diligence costs, technology due diligence costs, and opportunity costs that Fintex incurred all occurred because Mr. Smith failed to act in good faith and solely for the benefit of Fintex.

69.     Fintex's injuries would not have occurred if Mr. Smith had acted in good faith and solely for Fintex's benefit. If Mr. Smith had acted in good faith, Fintex would never have considered acquiring ActiveWorx to the extent it did. So, his failure to act caused Fintex's injuries.

WHEREFORE, Fintex and Mr. Weinstein demand the entry of judgment in their favor and against Mr. Smith, together with such other relief as the Court deems just and proper.

## COUNT IV
## FRAUDULENT CONCEALMENT

70.     Paragraphs 1 through 69 of these Counterclaims are incorporated by reference as if set forth fully herein.

71.     When he was conducting due diligence on the ActiveWorx project, Mr. Smith omitted much essential information. He omitted that ActiveWorx was a brittle, high-risk, and inefficient company. He omitted that ActiveWorx's relationship with its customers was quite tenuous. At best, customers were not prepared to invest further in ActiveWorx or expand their relationship with them. Further, he omitted that ActiveWorx had invested extensive capital in a payment product that had no chance of being viable. In other words, ActiveWorx was a company with little chance of growth and fundamental flaws. Mr. Smith omitted all these relevant facts from his analysis of ActiveWorx.

72.     The point of due diligence is to assess whether a particular business is worth acquiring. Mr. Smith's omission of these significant facts was material to Fintex's potential acquisition of ActiveWorx because the deal may have gone through if Mr. Weinstein had not discovered this information by questioning ActiveWorx's leadership.

73.     When he became a co-venturer, Mr. Smith was purportedly an expert in sales strategy and optimization who should have been able to conduct due diligence without making such glaring mistakes. Moreover, Mr. Weinstein had articulated his concerns about ActiveWorx earlier in the process, but Mr. Smith had knowingly disregarded those risks. Instead, he continued to advocate for ActiveWorx as a "hidden gem," recklessly omitting the information that would be essential to determine if it was, in fact, such a find.

74.     By omitting this crucial information, Mr. Smith hoped to have the rest of his co-venturers rely on his deficient analysis and approve the acquisition of ActiveWorx. That outcome would have been in his self-interest because he could have played a senior role in ActiveWorx (a Pennsylvania-based company).

75.     Mr. Smith continuously projected enthusiasm about doing the due diligence on the ActiveWorx project. Since Mr. Smith was a co-venturer (and a purported expert in sales strategy and optimization), Mr. Weinstein and the other Fintex co-venturers justifiably relied on Mr. Smith's due diligence—which included these glaring omissions of material facts.

76.     If Mr. Smith had included this essential information about ActiveWorx's actual condition, Fintex would not have considered acquiring ActiveWorx. Mr. Weinstein and Mr. Lemberg would not have traveled to Pennsylvania to meet with ActiveWorx's leadership (thus not incurring those costs). The legal due diligence costs, technology due diligence costs, and opportunity costs all occurred because Mr. Smith omitted this information from his due diligence. So, the injuries that Fintex and Mr. Weinstein sustained were proximately caused by their reliance on Mr. Smith's deficient due diligence.

WHEREFORE, Fintex and Mr. Weinstein demand the entry of judgment in their favor and against Mr. Smith, together with such other relief as the Court deems just and proper.

## COUNT V
## <u>NEGLIGENT MISREPRESENTATION</u>

77.     Paragraphs 1 through 76 of these Counterclaims are incorporated by reference as if set forth fully herein.

78.     While doing due diligence, Mr. Smith told Mr. Weinstein, "ActiveWorx is a hidden gem." (It wasn't.) He admitted that ActiveWorx was poor at managing customers. But he stated that with some tech upgrades, it could be a very profitable business. Mr. Smith's statement that ActiveWorx is a "hidden gem" was a representation.

79.     Mr. Smith's representation was material to whether Fintex acquired ActiveWorx.

80.     Without his positive assessment, Fintex would not have continued down that path.

81.     Mr. Smith knew this representation was false, or he should have known it was false, as it was apparent that ActiveWorx was not a "hidden gem" and that it was not likely to become a profitable business.

82.     By repeatedly making this false representation, Mr. Smith intended to mislead his co-venturers into relying on it. Given the confidential relationship between the parties, Fintex and Mr. Weinstein trusted and relied on Mr. Smith's word. Their reliance on Mr. Smith's word and the acquisition of ActiveWorx would have benefitted Mr. Smith because he could have played a senior role in ActiveWorx (a Pennsylvania-based company).

83.     Fintex incurred hundreds of thousands of dollars in costs because it justifiably relied on Mr. Smith's representation that ActiveWorx was a "hidden gem." This justifiable reliance was the proximate cause of these costs.

WHEREFORE, Fintex and Mr. Weinstein demand the entry of judgment in their favor and against Mr. Smith, together with such other relief as the Court deems just and proper.

## COUNT VI
## INTENTIONAL MISREPRESENTATION

84.     Paragraphs 1 through 83 of these Counterclaims are incorporated by reference as if set forth fully herein.

85.     While doing due diligence, Mr. Smith told Mr. Weinstein, "ActiveWorx is a hidden gem." (It wasn't.) Mr. Smith admitted that ActiveWorx was poor at managing customers. But he stated that with some tech upgrades, it could be a very profitable business. Mr. Smith's statement that ActiveWorx is a "hidden gem" was a representation.

86.     Mr. Smith's representation was material to whether Fintex acquired ActiveWorx.

87.     Without his positive assessment, Fintex would not have continued down that path.

88.     When he became a co-venturer, Mr. Smith purported to be an expert in sales strategy and optimization. He knew or should have known his claim that ActiveWorx was a "hidden gem" was false. His assessment that this was a true statement was reckless, considering his level of knowledge and experience. It was also reckless because Mr. Weinstein had expressed his concerns about ActiveWorx.

89.     By repeatedly making this false representation, Mr. Smith intended to mislead his other co-venturers into relying on it. Relying on it and acquiring ActiveWorx would have benefitted Mr. Smith because he could have played a senior role in ActiveWorx (a Pennsylvania-based company).

90.     Mr. Smith was a co-venturer and purported sales strategy and optimization expert. So, Mr. Weinstein and the Fintex co-venturers justifiably relied on Mr. Smith's representation that ActiveWorx was a "hidden gem."

91.     Fintex incurred hundreds of thousands of dollars in costs because it justifiably relied on Mr. Smith's representation that ActiveWorx was a "hidden gem." This justifiable reliance was the proximate cause of these costs.

WHEREFORE, Fintex and Mr. Weinstein demand the entry of judgment in their favor and against Mr. Smith, together with such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38(b), Fintex and Mr. Weinstein demand a jury trial on all triable issues.

Respectfully submitted,

**McNEES WALLACE & NURICK LLC**

By: _/s/ Erik R. Anderson_____
Erik Roberts Anderson (I.D. 203007)
Adam L. Santucci (I.D. 307058)
Conner H. Porterfield (I.D. 330676)
100 Pine Street
Harrisburg, PA 17101
(717) 232-8000
eanderson@mcneeslaw.com
asantucci@mcneeslaw.com
cporterfield@mcneeslaw.com

*Counsel for Defendants/Counterclaim-*
*Plaintiffs*

Date:   August 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I served a true and correct copy of this document upon counsel of record via the Court's ECF system.


Date:   August 5, 2024

*/s/ Erik R. Anderson*
Erik R. Anderson
